Thomas H. O'Neal

*v.*

Levi D. Boone *et al.*

1. PLEADING AND EVIDENCE—*variance—when not fatal.* Where a bill in chancery charged that the vendor of land agreed with another to whom he conveyed to send notices of forfeiture to the vendee, in violation of a contract to extend the time of payment, and to have an outstanding mortgage of the vendor assigned for the benefit of such grantee; and the bill also charged that such grantee and those claiming under him had notice of the vendee's equities, it was *held,* that the former charge might be disregarded if not sustained by the proof.

2. Where a bill in chancery, to set aside conveyances as a cloud upon an equitable title of the complainant, is framed upon the theory that the land was purchased by A, alone, from a voluntary grantee, and the evidence shows that the purchase was by A, B, C and E, but the conveyance made to A, alone, for convenience, to hold and convey as directed by the purchasers, the variance will be fatal.

3. SPECIFIC PERFORMANCE — *when time is essential.* Where the purchaser of land, under a contract making the times of payment essential, makes all his payments promptly, except the last, and tenders that within the time agreed upon for an extension, he will be entitled to a specific performance of the contract as against the vendor and his voluntary grantee, and those claiming under them with notice of his equities.

4. MORTGAGE — *when satisfied, though assigned.* Where a mortgagee furnishes another the money with which to procure an assignment to the

latter of the mortgage, under which a sale is had to cut off the rights of an intervening purchaser, this will be a satisfaction of the mortgage, except as to subsequent *bona fide* purchasers without notice.

5. Trustee—*whether a conveyance is made to one as such.* Where the facts and circumstances relied on, to show that a conveyance of land is made to one in trust for the original owner, are reasonably consistent with the *bona fides* of the transaction, the latter will be adopted, especially to protect rights subsequently acquired.

6. Conveyance—*burden of proof to impeach.* The legal presumption is, that all conveyances are made in good faith, and not fraudulently, and the burden of proof rests upon one who seeks to impeach the same for fraud.

7. Notice—*what is, of third person's equity.* The fact that a party, taking a conveyance of land from a party holding the legal title, knew the grantee held the same in trust for another, is neither actual nor constructive notice of the equities of a third person claiming to have purchased the land from the real owner.

8. Witness — *credibility.* In this case, facts and circumstances are given as affecting the credibility of a witness, so as to render it of but little weight.

9. Laches—*as affecting notice of claim.* Where a purchaser of land, after having paid all the installments except the last, and obtained an extension of time for its payment, was, before the expiration of the extended time, notified that his contract was forfeited, and the vendor conveyed to another, who paid nothing, and the purchaser, within the extension, tendered the balance due, and demanded a deed, the vendor promising to procure the same in a few days, but, instead of doing so, caused his grantee to convey to another, which deed was recorded, and the original purchaser, with notice of the facts, made no further claim for nearly twenty years, and paid no taxes, and then filed his bill to set aside the several subsequent conveyances, and to be invested with the title then in a *bona fide* purchaser, it was *held,* that his *laches* and delay in asserting his equities until others had acquired rights, was such as to bar his claim to relief.

10. Forfeiture — *right to question after other rights are acquired.* Although a declaration of forfeiture of a contract is not justifiable, yet, if the purchaser lies by for an unreasonable length of time without asserting his equities, until others have acquired the legal title in good faith, upon the honest belief that the forfeiture was rightful, and that he acquiesced in the same, his equities will not be superior to those thus acquiring the legal title, and they will be protected against his claims.

Writ of Error to the Superior Court of Cook county; the Hon. S. M. Moore, Judge, presiding.

On the 18th of June, 1852, Fredrick H. O'Neal made a contract with Stephen Bronson, Jr., to purchase of him one part of the property in controversy, and on the 1st day of July, 1852, he made another contract with him to purchase the remainder of the property. Both contracts were in writing, and placed on record shortly after they were executed. A small sum was paid on each contract at the time it was made, and the residue of the payments were to be made by O'Neal, in annual instalments, in 1853, 1854 and 1855. O'Neal paid the taxes on the property for two or three years, and all the instalments of the purchase money except those due in 1855. Before these matured, he wrote to Bronson, requesting an extension of time within which to make the payments until October of that year, and Bronson replied, agreeing to the desired extension.

It was provided in the contracts that, in case O'Neal should make default, or fail to make any of the payments when due (the times of payment being declared to be an essential part of the contract). or should fail to punctually perform any of the covenants by him to be performed, the contracts and all the covenants and agreements on the part of Bronson should, at his option, or that of his representatives and assigns, be, and they were thereby, declared to be null and void, and no longer binding, and all the rights or interest of O'Neal therein, either in law or equity, should cease and determine, and all payments which might have been made thereon were to be forfeited.

Shortly after Bronson replied to O'Neal consenting to the extension of the payments, he sent O'Neal formal notices, declaring the contracts forfeited in consequence of his failure to make payments at the times specified in the contracts, and thereafter, on the 29th of August, 1855, Bronson conveyed the property by deed with covenants of warranty, excepting, however, back taxes, to Sherman P. Tracy, which deed was placed on record August 31, 1855. O'Neal, who resided at Fredrick, Maryland, received the notices of forfeiture by due course of mail, and, about the 18th of September, 1855, visited Bronson

at Chicago, and had an interview with him at the office of J. W. Waughop, O'Neal's agent and solicitor. At that interview, O'Neal reminded Bronson of his consent to the extension of time for the payments, which Bronson acknowledged, and he then attempted to palliate his conduct in declaring the forfeiture, by saying that he had become financially involved, and had conveyed the property to Tracy, as his confidential friend, in order that it might be disembarrassed of other liens, and, at the same time, under his control. O'Neal tendered him, then, in American gold, the amount due on the contracts. Bronson declined to accept the money, but acknowledged that the amount tendered was correct, and directed him to leave it with Waughop, promising to get a deed from Tracy to O'Neal when he should see Tracy. O'Neal then returned to his home, in Maryland, and did not again visit Chicago, with reference to the property, until in 1865. He seems, indeed, to have been in Chicago in 1856, but it does not appear that he then did anything with reference to the property.

On the 28th of September, 1855, Tracy conveyed the property to Berry, and the deed was recorded the next day (the 29th).

In 1851, Bronson, while the owner of an undivided interest in this and other property, as a tenant in common with certain other parties, had executed a mortgage to one Sayre, to secure a large sum of money, and the mortgage was duly recorded at or near the date of its execution. Subsequently, this property was set off to Bronson by decree for partition between him and his co-tenants, so that the mortgage, if still subsisting, attached to this property, and was a prior lien to the claim of title by virtue of the O'Neal contracts. Sayre, by deed dated September 10, 1852, and recorded October 22, 1852, transferred his interest in the mortgage to Magie, covenanting therein, among other things, that he was the lawful holder of the notes secured by the mortgage, and that there was then due and unpaid thereon $7500. Magie, by deed dated October 31, 1855, and recorded November 6, 1855, transferred his interest in the mortgage to Sherman P. Tracy, covenanting

therein that he was the lawful holder of certain unpaid notes secured by the mortgage, upon which there was then due the sum of $2500, with certain additional interest.

On the 18th day of December, 1855, Tracy executed a deed, which was recorded on the 19th of January, 1856, purporting to convey the property, by virtue of a sale under the mortgage, and pursuant to the power therein and the several assignments thereof, to A. Judson Higgins, and Higgins, by deed dated December 22, 1855, and recorded March 21, 1857, conveyed the property to Berry.

On the 10th day of October, 1856, Berry conveyed the property to Daniel L. Boone. Daniel L. Boone afterwards conveyed an undivided half of the property to Waller, and on the 16th day of June, 1860, he conveyed the residue to Levi D. Boone, and the deed was recorded immediately afterwards.

Loomis obtained a judgment in the circuit court of Cook county, against Bronson and another, on the 14th of June, 1855. Execution issued thereon within time to preserve the lien of the judgment, and levy of execution was made on the property in controversy. One part was sold to Miller, who received a sheriff's deed therefor on the 21st of May, 1857, which was recorded on the 25th of September, 1857, and the other part was sold to Loomis, who received a sheriff's deed therefor on the 28th of November, 1860, and which was recorded on the 3d of December, 1860. Miller conveyed the interest he held to Loomis, by deed dated May 23, 1857, and recorded September 25, 1857, and Loomis conveyed to Levi D. Boone, by deed dated November 28, 1860, and recorded December 3, 1860.

On the 28th of November, 1855, Tracy executed a deed to O'Neal for the property, but which was not delivered until in 1865; and Bronson also conveyed to O'Neal the property described in the first contract, February 22, 1865, and that described in the second contract, on 27th of February, 1865, and on the 1st of January, 1866, he executed another deed to him to correct an error in that of February 27, 1865.

Bill was filed by O'Neal on the 13th of March, 1872, for the purpose of procuring the removal of alleged clouds upon his title, and having Boone declared to hold in trust for him, and to convey to him the title he holds. Boone, Waller and others were made defendants. Answers were filed by Boone and Waller, putting in issue all the material allegations of the bill. Boone claims therein to have been a purchaser, in good faith, without notice of any equities in favor of O'Neal, and sets up the statutes of limitations, and *laches* on the part of O'Neal, to bar his rights, if any he has.

On hearing, the court decreed that O'Neal had no equity, and that the bill be dismissed.

Mr. Lyman Trumbull, and Mr. J. W. Waughop, for the plaintiff in error.

Messrs. Sleeper & Whiton, for the defendants in error.

Mr. Justice Scholfield delivered the opinion of the Court:

It is very clear that the evidence fails to sustain the entire theory of the bill. The charge that Levi D. Boone and Bronson agreed, before Bronson sent the notices of forfeiture to O'Neal, and conveyed to Tracy, that Bronson should send the notices of forfeiture, convey to Tracy, have Magie assign the Sayre mortgage to Tracy, and him to go through with the form of a sale and conveyance thereunder to Higgins, and procure the execution of the several other conveyances by which the legal title to the property in controversy was ultimately vested in Boone, is not only unsupported by the evidence, but is positively disproved. Even Bronson, the most unfavorable, and evidently an unfriendly witness to Boone, does not pretend that his acts were, in any degree, prompted by Boone, or that it was anticipated that Boone would acquire the title before the negotiations in 1856, which resulted in the conveyance to Daniel L. Boone.

We are, however, of opinion that, disregarding this charge, the allegations in the bill charging that Boone and those under

and through whom he derived title, were purchasers with notice of O'Neal's equity, would have been sufficient of themselves to have called for an answer, and that we are therefore not at liberty to affirm the decree of the court below simply because of the failure of the proof in respect to the other charge.

That O'Neal, as against Bronson, or any one simply occupying his place, is entitled to the property, can admit of no controversy. He purchased, originally, in good faith, paid all that was due, at the times stipulated in his contracts, with the exception of the last payments, and, as to these, Bronson consented to an extension of time, and before its expiration O'Neal tendered him the full amount due, which Bronson has since accepted. But if O'Neal, by his failure to exercise ordinary prudence, suffered Bronson to place a title of record inconsistent with the continuance of his rights as purchaser, and others, without actual knowledge of his rights, and upon the faith of the title as disclosed by the record, in good faith, purchased the property and obtained the legal title thereto, they do not occupy the place of Bronson, but of *bona fide* purchasers without notice, and their legal title must prevail over O'Neal's equity.

It is claimed the conveyances by Bronson to Tracy, by Tracy to Berry, the assignment of the mortgage by Magie to Tracy, the pretended sale and conveyance thereunder by Tracy to Higgins, and the conveyance by Higgins to Berry, were all voluntary, and that Tracy, Higgins and Berry held the title simply for the convenience of Bronson, and to enable him to perpetrate a fraud upon O'Neal; and that when Levi D. Boone became a purchaser, and had the property conveyed by Berry to Daniel L. Boone, he had actual knowledge of these facts, and that he also knew that Bronson had consented to extend the time of the last payments on the contracts; that O'Neal had tendered him the amount due within that time, and that Bronson had agreed to have the property conveyed to him.

The evidence fully shows that Bronson's conveyance to

Tracy was voluntary; that Bronson furnished Tracy the money to buy the mortgage from Magie, and that the pretended sale and conveyance under the mortgage were without consideration; and that Tracy and Higgins, in all things, acted for and under the direction of Bronson.

The position that Berry occupied with reference to the property is not so clear. Bronson says the conveyance to Berry was wholly for his benefit, and for the purpose of having it appear upon the record that he had conveyed away the title, and, at the same time, to keep it under his control. Berry, while showing that he acted in the matter entirely under the direction of E. S. Smith, says he acted in good faith; and, evidently, if he held the title for Bronson, he did so without knowing it.

It is possible Smith may have agreed to have the title held for Bronson, and had Berry hold it under his own direction and control for that purpose; but this is not charged in the bill nor supported by direct proof. It is, at most, but a matter of inference from circumstances which are reasonably susceptible of a construction consistent with the *bona fides* of the conveyance to Berry.

Bronson says the reason that the conveyance was made to Berry was, that Tracy had gone East to live, and it was not certain that he could readily confer with him. But from other evidence, it is very clear Tracy had not then gone East—Bronson himself shows this, and Berry says Tracy was present at the negotiations. Moreover, Berry, although then in Chicago, and probably occasionally temporarily there at other times, was a resident of Lagrange, Ky., where he would be almost, if not quite, as difficult of access as would Tracy be, in the State of New York.

In addition to this, in answer to the 17th cross-interrogatory, Berry says: "There was an agreement by which Bronson or Tracy was to perfect the title to the property, and they deposited collaterals to make good the agreement, (with another person, name now forgotten,) but some time thereafter, he, Bronson, obtained, by fraud, the consent of deponent to with-

draw the valuable ones and substitute worthless ones in their stead. which he represented as more valuable than the ones withdrawn."

It is impossible to reconcile this with the idea that Berry was a mere trustee or agent of Bronson, through a secret understanding between Bronson and Smith, or otherwise. The agreement to perfect the title imposed an obligation to make good an absolute, and not merely a colorable title; and Bronson could only have obtained the collaterals from Berry by fraud, on the hypothesis that Berry was, in good faith, the holder of the collaterals.

Again, Berry, through Smith, contracted, at one time, to sell the property to one Flournoy, of Paducah. The contract was reduced to writing, and failed only, as Berry says, because Flournoy became dissatisfied with the title, when, as he learned from Smith, it was rescinded. He speaks of this as a contract made in good faith, for his and Smith's benefit, and Bronson makes no claim to have been in any way interested in it. The circumstance that, after Boone, Smith, Waller and Boyle purchased, Boone obtained the notes given by Berry for the property, from Smith, as evidence that they had been paid. and the mortgage to secure them satisfied, we do not regard as necessarily inconsistent with the good faith of Berry in the transaction; nor do we regard the fact that the conveyance by Higgins to Berry subsequent to Berry's purchase, was made without the actual knowledge of Berry, in that light. What the precise relations existing between Berry and Smith were, in this, and other transactions in Chicago in which Berry's name was used, is not clear, further than it was one in which Berry gave entire and unlimited confidence to Smith. Berry says, in all such transactions. Smith did the negotiating. He signed deeds when Smith requested. He made notes, which Smith indorsed, upon which money was obtained in bank, etc.

If the charge in the bill and the evidence showed that Smith was in the employ of Bronson. then we should have no hesitancy in saying that Berry was used for Bronson; but in the absence of such charge and proof, we think it is of but

slight moment what were the precise relations between Berry and Smith. Smith, we may assume, without changing results, was the real party, and Berry's name was used by him as a mere cover to hide himself from the public—but, manifestly, until it is shown that Smith was acting for some one besides himself or Berry, it concerns no one else to know why they so acted.

Under the peculiar relations existing between Berry and Smith, it was Smith, and not Berry, that was looking after the title and attending to the payment of the notes; and the reasonable presumption is, the conveyance by Higgins was pursuant to the understanding between Smith, Tracy and Bronson, and that the notes were taken up by Smith before being presented to Boone. Whether Bronson received the money paid by Boone, or other money, in payment for the land, can make no difference, if the sale was actually made to Berry or Smith. It is very clear that Bronson knows nothing about the source from which the money he received came, except on information he had from his attorney, Charles H. King.

Bronson and Berry are O'Neal's witnesses. On their evidence alone he seeks to establish that Berry was a mere trustee for Bronson. The legal presumption is, that all conveyances are made in good faith, and not fraudulently, and the burden was on O'Neal to make proof of the charge of fraud. This, we can not say, as respects Berry, has been successfully done.

Assuming Berry to have been a *bona fide* purchaser, either for himself or Smith, as the understanding between them may have been, we have no difficulty in coming to the conclusion that he purchased without actual knowledge of O'Neal's equity.

The fact testified to by Berry, that it was understood, at the time of the negotiations in his behalf, that the title was imperfect, may be explained by reference to what was then disclosed by the record with reference to the property. This negotiation occurred on the 28th of September, 1855. The Sayre mortgage was then outstanding, apparently, at least, in Magie, and the record of Sayre's assignment disclosed that

there was still due upon it $7500. Loomis' judgment had been obtained on the 14th of June preceding, and being prior to the conveyance to Tracy, even if that conveyance had not been known, as it was, to have been voluntary, must have been understood to have been a lien upon it; and, in addition to this, it is in proof that the Merchants and Mechanics' Bank recovered a judgment against Bronson, during the year 1855, for $25,000, which, upon the issuing of execution within a year, would become a lien upon all his property. Here, then, surely, was enough to make the title be regarded as "imperfect," as that term would be ordinarily used and understood by persons other than lawyers. Berry denies that he knew anything about what occurred affecting the sale of the property or its title, between Bronson and O'Neal. Bronson does not claim to have communicated anything to Smith in that regard, and there is no pretense that any one else did.

Berry knew that Bronson was the real owner, and Tracy but the trustee, when the property was conveyed to him; but we are aware of no authority for holding that was either actual or constructive notice of O'Neal's equity.

The doctrine is too familiar to need the citation of authorities, that, if the title which Berry held was acquired in good faith, for a valuable consideration, and without notice of O'Neal's equity, a purchaser of that title will hold as against O'Neal, notwithstanding he knew, at the time of his purchase, of O'Neal's equity.

Bronson testifies that the purchase was by Levi D. Boone, alone, of the title held by Berry, and the bill is framed on that theory.

A careful examination of Bronson's evidence shows that, in point of fact, he knows nothing about it. He was not present when the purchase was made, and only knows as he was informed by his attorney, Charles H. King. The evidence is conclusive that the purchase was by Smith, Waller and Boyle, and Levi D. Boone,—Boone to have only an undivided half, and the others the other undivided half of the property. The conveyance was made to Daniel L. Boone, for convenience, to

hold and convey as directed by the purchasers. He has conveyed one undivided half of the property, since then, to Waller, and the other undivided half to Levi D. Boone. In this respect, there is a material and fatal variance between the allegations and the proofs.

But, (although it is not necessary to an affirmance of the decree, in view of what has been already said,) we do not think the evidence satisfactorily shows that the purchasers of the title, as conveyed by Berry, had actual notice of O'Neal's equity at the time of the purchase. There is not a particle of evidence that Smith, Waller and Boyle had such notice. On the contrary, Waller shows that, when O'Neal's contracts were mentioned, the notices of forfeiture were referred to, and Smith asserted there could be no trouble on that account, and they purchased in that belief.

Bronson swears, in general terms, that Boone knew, before he purchased, of O'Neal's claim. Boone positively denies it, and asserts that he purchased in good faith, without knowing that O'Neal was then claiming to have any interest in the property.

As between Bronson and Boone, we can not hesitate in preferring Boone, interested though he is in the result. By Bronson's own testimony it is shown that he is a reckless, unscrupulous and dishonest man. He says, that after agreeing to extend the time for O'Neal to make the last payments on his contracts, he sent him notices of forfeiture, and conveyed to Tracy. When O'Neal reminded him of his promise he agreed to not enforce the forfeiture and to obtain the title for him. A few days after this, however, instead of having Tracy convey to O'Neal, as he had agreed, he negotiates with Smith to convey to Berry, and has Tracy make that conveyance. Then, a few days after this, he has Tracy make a deed to O'Neal, which he keeps in his possession until in 1865, without letting any one know of its existence. He receives from his attorney, King, $2500 for the property after it was conveyed to Daniel L. Boone, for Smith, Waller and Boyle, and Boone. In 1865, he receives from O'Neal the balance due on

his contracts from him, makes individual deeds to him, and delivers to him the deed which he had from Tracy to him and had secretly held for ten years. In 1855, in order to strengthen the appearance of title, adverse to any claim in favor of O'Neal, he has a pretended sale and conveyance under a mortgage that he had paid off; and, subsequently, and evidently to cloud and disparage that same title, he has the record of the mortgage entered satisfied. He has, as he shows, no very friendly feeling towards Boone. For a while, and up to some time in the year 1855, Boone was, nominally, president of the Merchants and Mechanics' Bank, (an institution existing under the old Banking law of this State,) of which Bronson was cashier. He says that he had trouble with the directors, and Boone sided with the directors. Here, then, is a motive for revenge, and we can scarcely doubt that, in gratifying it, he would not be very scrupulous as to the method. Apart from his bad conduct, referred to above, there are several other circumstances that forcibly tend, in our opinion, to corroborate Boone. In the first place, Bronson nowhere says that he informed Boone that, after he had given O'Neal notices of forfeiture, he consented to extend the time, and that O'Neal had, within that time, tendered him the amount due and he had promised to have Tracy convey to him. On the contrary, so late as in 1857, when the suit of *Loomis* v. *Riley*, 24 Ill. 307, was pending or anticipated, and Boone, who was Riley's landlord, was, evidently, looking about for evidence in support of his title, Bronson made and sent him this affidavit:

"I, Stephen Bronson, Jr., being duly sworn, doth depose and say, that the payments on two certain contracts or agreements," (describing those with O'Neal,) "have not all been made as the agreements specified, and that a portion of them are still unpaid, and that the contracts or agreements have been declared null and void on account of the said O'Neal's not having made the payments as required by said contracts or agreements." Which he subscribed and swore to.

Now, although the implication from this affidavit was, in fact, false, and the making of it is another evidence of the

utter recklessness and depravity of the man, it shows, beyond cavil, that he was then endeavoring to induce Boone to believe that O'Neal's rights under the contracts had been terminated by the declaration of forfeiture. We can not believe that he would have had the audacity to send the affidavit to a man to whom he had communicated that he had waived the forfeiture under the contracts.

Boone was a man of some experience in real estate matters, occupying an honorable position among his neighbors—having at one time, shortly prior to this purchase, been mayor of the city of Chicago, and it is not reasonable to suppose Bronson would have assumed him to have been either so ignorant of the law or so reckless in the use of his money as to have invested a considerable sum of money (equal to the full value of the property) in purchasing property which he was informed equitably belonged to another. It did not subserve the end Bronson had in view, of twice selling and getting pay for the property, to tell Boone all; and the price paid by Boone ($2500 for the undivided half of it, which is not claimed to have been less than it was worth,) tends to show that Boone was conscious of no outstanding equity that imperiled his title.

One Cline, however, swears that he informed Boone that Bronson had extended the time of payment on the contracts; that O'Neal had left the money in the hands of Wanghop to make payment, and that Bronson had agreed to have Tracy make a deed to him. This is denied, *in toto*, by Boone.

It does not appear that Cline had any control over or interest in the property, at the time, and he says that after he made the communication Boone did not say much. In his direct examination, he says this occurred in the early part of the fall of 1856; but, on cross-examination, on being required to fix the time with particularity, he says it was in September, 1855, about a week or ten days after O'Neal had returned East. Even if it be true, that he made the communication he says he did, we think, coming from an uninterested party, at a period so remote from the time of the actual purchase, it can

not, of itself, be held actual notice of O'Neàl's equity. Boone's purchase was not made until the 10th of October, 1856. A communication made in September, 1855, by an uninterested party, might well have passed out of mind by October, 1856.

But, even if in September, 1855, Boone had known of the understanding between Bronson and O'Neal, would not the fact that O'Neal had failed to procure the title, and that, meanwhile, Tracy had conveyed to Berry, authorize the inference that O'Neal had ceased to claim a deed under the contracts?

O'Neal, we think, was guilty of inexcusable negligence, under the circumstances, in not taking prompt steps, after his tender, to insure the execution of his deed. He already had abundant evidence of Bronson's treachery and faithlessness. The pretext for conveying to Tracy, he should have seen, was false, for no judgment against Bronson, subsequent to the recording of his contracts, could affect his interest in the property or interfere with Bronson conveying to him, and prior liens could not be removed or avoided by conveying to Tracy. Why did he not then obtain his deed? Tracy was in the city, the money was ready, and there appears no reason why there ought to have been a delay, or why a prudent man, under the circumstances, would have consented to a delay. He says he was again in Chicago in the fall of 1856, but he does not pretend to have done anything then towards getting his deed. The record, of which he is charged with notice, then disclosed that, within a few days after Bronson had agreed to obtain a deed from Tracy to him, Tracy had conveyed to Berry, thus passing the title into other hands, over which he had no reason to believe Bronson had any control. He brought no suit to set aside that conveyance and have specific performance of his contracts; paid no taxes on the property; made no effort to obtain possession of the property, and did not even call upon Tracy or Berry to make known his rights and have them protected. It is true, the records gave notice of the terms of his contracts, and that all persons subsequently dealing with the property are bound to know what those terms

were; yet, those terms authorized a declaration of forfeiture for non-performance of any of the covenants, and, although it could not be assumed there had been a declaration of forfeiture, from the lapse of time only, the record of the conveyances by Bronson to Tracy, and by Tracy to Berry, was conclusive evidence, to those who had no notice that they were made for the benefit of O'Neal, that Bronson had declared the contracts forfeited; and the non-assertion of rights, under the contracts, by O'Neal, was sufficient evidence of his acquiescence in the forfeiture. It is not to be assumed that conveyances are made in bad faith; and those who, without actual notice, or what is equivalent thereto, of bad faith, purchase property, are authorized to rely upon the state of the title as disclosed by the records.

We think, even if Boone had heard and understood what Cline says he told him, early in the fall of 1855, he had a right to believe, in October, 1856, and act upon the assumption, since O'Neal had not taken possession or paid the taxes on the property, or instituted proceedings on his contracts to enforce specific performance, and the title had, meanwhile, been conveyed to Berry, that the contracts had been forfeited. At all events, as between Boone and O'Neal, under the circumstances, the negligence of O'Neal is the more culpable, and he can not, therefore, be said to have the superior equity.

In the absence of clear and satisfactory proof that Boone, Smith, Waller and Boyle actually purchased in bad faith, being fully cognizant of all the facts going to show O'Neal's equity, there are other circumstances which render it extremely inequitable that O'Neal should have the relief he asks. The evidence does not even tend to impeach the good faith of the judgment in favor of Loomis against Bronson. So far as the title obtained by Boone and Waller is concerned, that judgment was a prior lien, and the title derived under it was superior.

There is no evidence that the ejectment suit of *Loomis* v. *Riley, supra,* was prosecuted in the interest of Boone and Waller, or in bad faith. Their title being junior, the only

defense their tenant, Riley, could interpose, was the claim of title under the Sayre mortgage. They could not rely upon the contracts of O'Neal, because the record showed conveyance by Bronson, subsequent to those contracts under which they derived title, which implied their forfeiture. *O'Neal* v. *W. Av. Bap. Church et al.* 48 Ill. 350. And when the court adjudged that the Sayre mortgage was extinguished, before the several assignments of it and sale thereunder, we do not perceive any other defense they could have interposed to the prosecution of the suit.

The judgment, in that suit, established that Loomis had the paramount title, and gave him the possession of the property. The only alternative apparently left to Boone and Waller, was either to surrender possession or purchase the title of Loomis. Boone chose the latter, and we can not doubt his good faith in so doing. The price paid for that title was $3600, and there is no evidence that it was, at the time, inadequate. This was not the mere strengthening or propping up of a defective title, but the acquisition of a new title—paramount to any title under which he could make claim. It would be contrary to all principles of justice and right, that O'Neal, whose silence and want of diligence had permitted this title to become paramount, should have it conveyed to him, and especially as sought, without even so much as offering to reimburse Boone in the expense he had incurred on its account.

The legal title in regard to this property was determined in *O'Neal* v. *Boone*, 53 Ill 35, and *O'Neal* v. *Wabash Avenue Baptist Church et al. supra*, and, although the facts are materially different as presented in the present case, in view of all the circumstances, and the great and unexplained delay of O'Neal in giving notice of his rights and attempting to assert them, we do not perceive that his claim to equitable relief is better founded than his claim was at law.

The decree must be affirmed.

*Decree affirmed.*